IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

TAURUS BLOCKER,
        Petitioner,

vs.                                                Case No.:  4:14cv648/RH/EMT

JULIE JONES,
        Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 16).  Petitioner filed a reply (ECF No. 21).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2006-CF-3779, with one count of sexual battery involving serious physical force likely to cause serious injury (Ex. A at 2).[1]  Following a jury trial, Petitioner was found guilty as charged (Ex. A at 104, Exs. B, C).   On May 7, 2007, the court adjudicated Petitioner guilty and sentenced him to life imprisonment, with a 25-year mandatory minimum term (Ex. A at 108–16, Ex. E).   On May 17, 2007, Petitioner was re-sentenced to life imprisonment, with no mandatory minimum term (Ex. A at 127–35).   Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D07-3032 (*see* Ex. A at 142, Exs. G, H).   On April 9, 2009, the First DCA affirmed the judgment per curiam without written opinion (Ex. I).   Blocker v. State, 6 So. 3d 54 (Fla. 1st DCA 2009) (Table).   The mandate issued April 27, 2009 (Ex. J).

On August 26, 2009, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. K at 1–2). The state circuit court denied the motion on September 2, 2009 (*id.* at 3).   Petitioner

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 16).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

appealed the decision to the First DCA, Case No. 1D09-4841 (*id.* at 4).  The First

DCA affirmed the decision per curiam without written opinion on March 3, 2010 (Ex.

L).  The mandate issued March 30, 2010 (Ex. M).  Blocker v. State, 29 So. 3d 1119

(Fla. 1st DCA 2010) (Table).

On June 15, 2010, Petitioner filed a motion for post-conviction relief, pursuant

to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. N at 1–39, 96–116).

The state circuit court set an evidentiary hearing and appointed counsel for Petitioner

(*id.* at 121–25).  Following the evidentiary hearing, the circuit court denied the Rule

3.850 motion (Ex. N at 121–25, Ex. P at 442, 464–532).  Petitioner appealed the

decision to the First DCA, Case No. 1D12-5375 (Ex. Q).  The First DCA affirmed the

decision per curiam without written opinion on May 23, 2014 (Ex. T).  The mandate

issued June 18, 2014 (Ex. U).  Blocker v. State, 139 So. 3d 302 (Fla. 1st DCA 2014)

(Table).

Petitioner filed the instant federal habeas action on December 3, 2014 (ECF No.

1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an

application for a writ of habeas corpus in behalf of a person in custody pursuant to the

judgment of a State court" upon a showing that his custody is in violation of the

Constitution or laws of the United States.  As the instant petition was filed after April

24, 1996, it is subject to the more deferential standard for habeas review of state court

decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death

Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In

relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>> (2)    resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the evidence
>> presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review

in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The

appropriate test was described by Justice O'Connor as follows:

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by
Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer)
in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the
Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in
part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter,
Ginsburg, and Breyer.

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley

v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n.15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application

of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); see, e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by

clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").    The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision.  *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

## III.    PETITIONER'S CLAIMS

A.    Claim Nine:  "Whether the destruction of evidence violated due process and a fundamental [sic] fair trial."[3]

_____

[3] The court has re-ordered Petitioner's claims for organizational purposes.

Case No.:  4:14cv648/RH/EMT

Petitioner alleges that on the night of the crime, August 15, 1999, medical personnel collected vaginal swabs and a vaginal smear from the victim as part of a "sexual assault kit," and then gave the kit to police (ECF No. 1 at 34–35).[4] Petitioner alleges in May of 2003, police sent the sexual assault kit to the FDLE (*id.*).  He alleges that in August of 2003, a DNA analyst from the FDLE tested the vaginal swabs and vaginal smear and informed police that they contained a mixture of the victim's DNA and the DNA of a foreign donor (*id.*).  Petitioner alleges the analyst also informed police that the DNA would be "run through" the convicted offender database to develop a suspect (*id.*).  Petitioner alleges one month later, in September of 2003, police destroyed evidence, including a blanket, t-shirt, and women's underwear, as well as the sexual assault kit consent forms (*id.*).  He alleges police destroyed the sexual assault kit on March 16, 2004 (*id.*).

Petitioner contends the DNA evidence was critical to his conviction (ECF No. 1 at 35).  He contends the destruction of the sexual assault kit and other evidence prevented him from formulating a defense and thus deprived him of due process and a fair trial (*id.*).

---

[4] The page references to the parties' pleadings reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Respondent asserts Petitioner presented this claim to the state courts in Ground 1 of his initial brief on direct appeal (ECF No. 16 at 32).  Respondent contends the state court adjudicated the merits of the claim, and the adjudication was not contrary to or an unreasonable application of clearly established federal law (*id.* at 32–36).

### 1.    Clearly Established Federal Law

When the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant:  a federal due process violation occurs whenever such evidence is withheld.  *See* Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963); United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).  In Arizona v. Youngblood, by contrast, the Supreme Court recognized that the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  488 U.S. at 57.  In Youngblood, the police had not properly preserved a sexual assault kit and articles of clothing, resulting in expert testimony that nothing in the kit or the clothing could either identify the defendant as the perpetrator, nor could it exonerate him.  The Supreme Court concluded that the failure to preserve this "potentially useful evidence" does not violate due process

"unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58.

"[T]he applicability of the bad-faith requirement in <u>Youngblood</u> depend[s] not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence." <u>Illinois v. Fisher</u>, 540 U.S. 544, 549, 124 S. Ct. 1200, 157 L. Ed. 2d 1060 (2004).  To meet the standard of "material exculpatory evidence," the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." <u>California v. Trombetta</u>, 467 U.S. 488, 489, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984).  Where the evidence destroyed is "at best [only] 'potentially useful' evidence, . . . <u>Youngblood</u>'s bad-faith requirement applies." <u>Fisher</u>, 540 U.S. at 549.

<div align="center">

2.   <u>Federal Review of State Court Decision</u>

</div>

Prior to Petitioner's trial, defense counsel filed a motion to suppress all statements and evidence relating to DNA evidence, on the ground that the sexual assault kit was destroyed in 2003, and the defense was never given the opportunity to, and would never be able to, test the DNA evidence (Ex. A at 36–42).  Defense counsel argued that the destruction of the evidence violated Petitioner's federal due process

rights (*id.*).   The trial court held a hearing on the motion on the morning of April 27,

2007, and the transcript of that hearing is included in the state court record (Ex. P at

534–79.)  During the afternoon following the suppression hearing, defense counsel

deposed Jo Ellen Brown, the State's DNA expert.   Defense counsel then filed, the

same day, a supplement to the motion to suppress, asserting that according to the

evidence adduced at the suppression hearing, law enforcement "has no consistent idea

where the rape kit went or is, or even if it might still exist" (Ex. A at 78–79).   Counsel

argued that an evidence disposition form submitted by Officer Greg Adams requested

destruction of the evidence on or about June 30, 2003, and the State's witness testified

that the rape kit was destroyed on September 2, 2003.   However, Ms. Brown clearly

testified at her deposition that she returned the rape kit and vaginal swabs to the FDLE

evidence section on March 11, 2004 (*id.*).

The trial court adjudicated the issue as follows:

> This matter is before the court on the defendant's motion to
> suppress DNA evidence.  The defendant argues that because the sexual
> assault kit from which DNA testing was developed has been destroyed,
> the prosecution should not be permitted to introduce the results of the
> DNA testing.   Both the facts alleged by the prosecution and the
> procedural posture of the case must be considered in resolving the issues
> raised.

> The amended information alleges that on August 15, 1999, the
> defendant committed a sexual battery with great physical force against

a woman, C.K.  According to the affidavit of probable cause filed September 20, 2006, C.K. flagged down a police officer on August 15, 1999 at 12:30 am and reported that she had been beaten and raped with forced penile-vaginal penetration.  The officer observed injuries consistent with the reported beating.  C.K. reported that she was soliciting for prostitution at the time she was attacked.

The affidavit further states that C.K. was transported to a hospital and [a] sexual assault examination was performed.  During the examination, the sexual assault nurse took samples to attempt to preserve DNA evidence.

According to the affidavit of probable cause, "On 11/25/03 a DNA profile foreign to the victim was developed from vaginal swabs taken when she was treated at the ER.  The profile was then put into the Florida's [sic] Convicted Offender Database.  On 8/10/06 a DNA match was developed when compared to the DNA submitted by suspect Blocker."

The affidavit further alleges that after the officer learned of the DNA match with defendant Blocker, the officer "showed the victim a photographic line-up which included suspect Blocker.  There were six total photographs, each on a separate piece of paper.  The victim immediately identified suspect Blocker in the line-up as her attacker."

Mr. Blocker was arrested on September 21, 2006.  The office of the Public Defender was appointed to represent Mr. Blocker that same day.  The Court conducted a hearing on the defendant's motion to set bond or pretrial release.  The prosecution requested that the hearing be conducted pursuant to Arthur v. State and that the court deny bond to Mr. Blocker.  The court denied the State's request and set bond in the amount of $150,000.  Mr. Blocker apparently was unable to satisfy the bond set and his position continued to be that he demanded trial as quickly as possible.

A conflict lawyer was briefly appointed to represent Mr. Blocker, however Mr. Blocker's current counsel thereafter filed a motion to substitute for the Public Defender on December 19, 2006. The court granted the motion to substitute on December 20, 2006.

On January 4, 2007, the court conducted a case management conference and set the matter for jury selection on February 23, 2007.

On February 15, 2007, the State filed a motion to compel Mr. Blocker to give a DNA sample. According to the motion, the defense objected to the motion. Also on February 15, 2007, the State filed a motion to continue the trial in order to permit sufficient time to complete DNA testing. Mr. Blocker objected to the motion for continuance. The court conducted a hearing on both motions on February 16, 2007. The court granted the motion to compel Mr. Blocker to give a DNA sample and continued jury selection to March 23, 2007. The court also denied Mr. Blocker's oral motion to reduce bond.

On March 23, 2007, the morning of jury selection, the State informed counsel for the defense that the law enforcement agency custodian of the physical evidence in the case had disposed of certain items of physical evidence in the case including the sexual assault kit used to collect evidence from the person of C.K. the day of the alleged assault. The State moved to continue the trial date because of uncertainty regarding the circumstances and legal significance of the disposal of the physical evidence. The court continued jury selection to April 20 with trial to commence on May 4 to permit the parties time to resolve the issues regarding the DNA evidence. The defense filed a motion to suppress on April 2, 2007 arguing that all reference[s] to DNA evidence should be suppressed because of the destruction of physical evidence by law enforcement.

The court conducted an evidentiary hearing on April 27, 2007 to address Mr. Blocker's motion to suppress DNA evidence. The prosecution presented the testimony of Patti Wallace, the Tallahassee Police Department's Evidence Section Supervisor. Ms. Wallace testified

that the Department's written Standard Operating Procedures Manual
Property and Evidence Section directed, "The Property and Evidence
Section shall review all impounded items annually.  All cases meeting
the following criteria shall have disposition form sent to the impounding
officer or case investigator for review:  1. Cases that the Statute of
Limitations has expired. 2. Cases older than six months with no suspects.
3. All cases over two years old."

Ms. Wallace testified that pursuant to the Department's policy and
routine practice, the Evidence Section generated a form evidence
disposition request on June 26, 2003 to determine whether the subject
evidence should be destroyed because of the age of the evidence.  The
evidence disposal request form was submitted to the Investigator Greg
Adams, who was responsible for the case.   On June 30, 2003,
Investigator Returned [sic] the form to the evidence section after having
checked the box marked "DISPOSE OF PER DEPARTMENT
POLICY."  On September 2, 2003, an evidence technician placed a
sticker on the police report indicating that the Sexual Assault kit consent
forms had been destroyed.  On September 23, 2003, an evidence
technician placed a sticker on the police report indicating that 11 items
of clothing and personal effects gathered from C.K. had also been
destroyed.

Following the hearing, the State submitted a memorandum dated
April 27, 2005 from Sgt. Greg Adams.  The memorandum reads:

> The purpose of this communication is to respond to your
> request for reason the [sic] sexual battery kit was destroyed
> in this case.

> I received a request by our Property/Evidence technician in
> 2003 to dispose or retain evidence in this case.  Space in
> our evidence area is limited and we are asked to dispose of
> evidence that is not needed.

Upon reviewing this case, it was learned that the victim could not be located for a detailed interview and did not make herself available for further investigation. Secondly, the sexual battery kit was processed for evidence and all the necessary testing was completed.

Lastly, 4 years had passed with no contact with the victim and no suspect was identified.

Following the hearing the State submitted an additional document entitled Vehicle/Property Receipt. It shows that the rape kit for C.K. was submitted to FDLE for testing and received on May 28, 2003. The document bears a notation indicating that FDLE returned the rape kit to TPD property and evidence on March 16, 2004. The document bears a notation that the rape kit itself was destroyed on March 16, 2004.

The State provided a copy of the November 25, 2003 FDLE report of DNA testing of evidence gathered regarding the alleged assault of C.K. According to the report, FDLE tested vaginal smears taken from C.K. against C.K.'s blood standard. The FDLE's testing indicated "A DNA profile foreign to [C.K.] was obtained from the vaginal swabs at 11 of 13 STR loci. . . . The foreign DNA profile developed from the vaginal swabs will be entered in to the Combined DNA Index System (CODIS) for search purposes."

The State provided a copy of the March 7, 2007 FDLE report of the comparison of Mr. Blocker's DNA swab taken pursuant to this court's order. That report states that Mr. Blocker "is included as a possible donor to the foreign DNA found on the vaginal swabs" from C.K. referenced in the November 25, 2003 report.

There is no basis to suppress any evidence on this record and there is no evidence of any federal or Florida constitutional violation. First, I note that there is no indication that even potentially exculpatory evidence has been discarded. The defense has not presented any evidence to call into question the FDLE's testing in any way. The

defense has not hired an expert to evaluate the evidence. There is no evidence that the DNA was inaccurately analysed [sic] or that any expert would have done anything differently than what FDLE did if the swabs had been available. The most that the defense can say is that some other expert might have done a DNA test differently and that test might have come up with a different result. Because the defense has made no showing that the discarded evidence would have done anything other than inculpate Mr. Blocker, the defense cannot claim any prejudice from the loss of the evidence.

Additionally, the defense has not proven that the probative information obtained from the evidence has been destroyed at all. It is apparent that, at least at this point, the genetic information derived from the sexual assault kit was never lost, since the 2007 FDLE report indicates that Mr. Blocker's standard was compared in 2007 to the foreign DNA found on the swabs. Indeed there is no indication on this record that the swabs and other discarded evidence are necessary for or probative of anything once the DNA profile has been derived. According to counsel for the State, during the 2007 testing the FDLE laboratory was never aware that the original items were discarded.

As a practical matter, the defense cannot contend that it could have developed any exculpatory evidence if the swabs had not been discarded. The defense has not retained an expert to evaluate the work done by the FDLE lab—much less retest the same evidence. At the time the defense learned the swabs had been discarded, the case was set for jury selection that same day. The defense has made no showing that any defense expert was available then or now. If the swabs had been available, the case would have been tried and the jury would only have known the results of the FDLE's tests and, perhaps, what swabs look like.

There is no indication that the law enforcement officials acted in bad faith in disposing of this evidence. There is no basis to conclude other than that law enforcement personnel disposed of this evidence in the routine execution of their duties. Since the evidence was destroyed

three years before the police learned of any possible connection to Mr.
Blocker, Mr. Blocker cannot establish an inference of bad faith.

(Ex. A at 80–86).

On direct appeal of Petitioner's conviction, Petitioner argued that the trial court
erred by requiring him to show that the evidence was destroyed in bad faith (Ex. G at
16–20).  Petitioner argued that the due process clause of the Florida Constitution
required application of a balancing test, balancing the reasons for the unavailability
of the DNA evidence against the prejudice to him.  Petitioner argued that the
balancing test should include consideration of factors such as the materiality of the
missing evidence, the likelihood of mistaken interpretation of it by witnesses or the
jury, the reason for its nonavailability to the defense, and the prejudice to the
defendant caused by the unavailability of the evidence.  Petitioner argued that
applying such a balancing test to the facts of his case required reversal of his
conviction and a new trial.  Petitioner acknowledged that the First DCA was bound
by Florida Supreme Court precedent requiring a showing of bad faith, but he
requested that the First DCA address the constitutional issue and certify it as
presenting a question of great public importance so that Petitioner could obtain review
in the Florida Supreme Court.

The First DCA affirmed Petitioner's conviction per curiam without written opinion.

"[T]he summary nature of a state court's decision does not lessen the deference that it is due." Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also* Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See* Harrington, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See id.*; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the

petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The sexual assault kit and other items collected from the victim on the night of the rape were plainly the sort of "potentially useful evidence" referred to in Youngblood, not the material exculpatory evidence addressed in Brady and Agurs; indeed, none of the destroyed evidence possessed an exculpatory value that was apparent before it was destroyed in 2003 and 2004.  At most, Petitioner could hope that, had the evidence been preserved, another DNA test conducted on the evidence would have exonerated him.  *See* Youngblood, 488 U.S. at 57.  The state court found as fact that there no evidence that the Tallahassee Police Department acted in bad faith when they destroyed the sexual assault kit and other evidence.  At the time of the destruction, the case was "cold" due to the victim's failure to participate in the police investigation and the lapse of four years since the rape occurred.  Further, at the time the evidence was destroyed, in 2003 and 2004, Petitioner's DNA had not been entered into the convicted offender database (that did not occur until 2006), so DNA testing had not inculpated or exculpated him.  Additionally, the state court found as fact that the destruction was performed in accordance with the police department's routine

policy.  Petitioner failed to point to evidence in the state court record that clearly and

convincingly rebuts the state court's finding of no bad faith.

Petitioner failed to demonstrate that the state court's adjudication of his due

process claim was based upon an unreasonable determination of the facts, or that it

was contrary to or an unreasonable application of clearly established federal law.

Therefore, he is not entitled to federal habeas relief on Claim Nine.

B.   Claim Four:  "Trial counsel was ineffective for failing to request a
hearing to challenge the methodology of population frequency statistics."

Claim Five: "Trial counsel was ineffective for failing to investigate and
prepare a motion in limine to challenge the admissibility of an incorrect
statistical method."

Claim Six:  "Trial counsel was ineffective for failing to impeach state
witnesses on validity and reliability of opinion testimony."

Claim Eight:  "Trial counsel was ineffective for failing to consult,
investigate, and retain an expert on DNA or population statistics."

In Claim Four, Petitioner contends defense counsel was ineffective for failing

to request a hearing to challenge the statistical methodology used by Jo Ellen Brown,

the State's DNA expert, to calculate the population frequencies of the DNA profile

developed from the vaginal swabs collected from the victim (ECF No. 1 at 22–23).

Petitioner alleges that as a result of counsel's failure, the reliability of Ms. Brown's

methodology was not established (*id.*).  In Claim Five, Petitioner contends counsel

was ineffective for failing to research and investigate the statistical methodology used by Ms. Brown in calculating the population frequencies, and file a motion in limine seeking to exclude Ms. Brown's testimony regarding the population frequencies (*id.* at 24–27).   In Claim Six, Petitioner contends counsel was ineffective for failing to impeach Ms. Brown's trial testimony regarding the DNA evidence (*id.* at 28–29).  Petitioner also contends counsel was ineffective for failing to challenge Nurse Cardenas' qualifications for testifying that she analyzed the vaginal swab collected from the victim under a microscope, and determined that it contained semen (*id.*).  In Claim Eight, Petitioner contends counsel was ineffective for failing to consult with or retain an expert in the field of statistical methodologies in determining population frequencies with regard to DNA evidence (*id.* at 32–33).

Respondent asserts Petitioner presented these claims to the state courts as Claims Two, Three, Five, and Six of his original and amended Rule 3.850 motions (ECF No. 16 at 16–25, 28–32).  Respondent contends the state court adjudicated the merits of the claims, and the adjudication was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (*id.*).

1.    <u>Clearly Established Federal Law</u>

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, Petitioner is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms."  <u>Strickland</u>, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did

not present—were acts that some lawyer might do." <u>Jones</u>, 436 F.3d at 1293 (citing

<u>Chandler</u>, 218 F.3d at 1314–15 n.15).   Furthermore, "[e]ven if many reasonable

lawyers would not have done as defense counsel did at trial, no relief can be granted

on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the

circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir.

1994).   Counsel's performance is deficient only if it is "outside the wide range of

professional competence." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at

690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that

petitioner was "not entitled to error-free representation").   "[T]here are no 'absolute

rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d

1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317).   Indeed,

"'[a]bsolute rules would interfere with counsel's independence—which is also

constitutionally protected—and would restrict the wide latitude counsel have in

making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th

Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of

demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th

Cir. 2002).   The Supreme Court has cautioned that "'[i]t is not enough for the

defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

### 2.  <u>Federal Review of State Court Decision</u>

Petitioner raised these claims of ineffective assistance of trial counsel ("IATC") as Claims Two, Three, Five, Six, and Seven of his original and amended Rule 3.850 motions (Ex. N at 17–19, 98–105, 109–15).

The state court conducted an evidentiary hearing on Petitioner's IATC claims concerning counsel's failure to investigate and challenge the DNA evidence (Ex. P at 464–533).  Petitioner was represented by counsel at the evidentiary hearing.  The testimony of Petitioner and his former trial counsel, Attorney Brian Wolk, was the only evidence presented at the evidentiary hearing.

Attorney Wolk testified that he and Petitioner talked extensively about the theory of defense they would pursue (Ex. P at 467–93).  Wolk testified that they agreed that Wolk would file a motion to suppress the DNA evidence on the ground that the sexual assault kit had been destroyed, which prevented the defense from testing the DNA evidence.  Wolk testified that the court denied the motions to suppress, after which he and Petitioner again discussed the defense strategy they would pursue at trial.  Attorney Wolk testified that he and Petitioner agreed not to attack the "science" of the DNA evidence or the population frequency statistics.  Wolk testified that he was familiar with the State's expert, Jo Ellen Brown, and he reviewed her report.  Wolk testified that Ms. Brown was "highly qualified" and "astute" in the field, and he did not believe that there was any way of successfully cross-examining her methodology or conclusions.  Wolk testified that he and Petitioner decided to present the jury with evidence and argument that even though Petitioner's DNA was

found on the victim, Petitioner did not rape her.  Attorney Wolk testified that the victim was an admitted prostitute, and Petitioner had admitted in a police interview that he occasionally solicited prostitutes. Wolk testified that there was a lot of conflict between the victim's initial statements to police and medical personnel, and her subsequent statements to law enforcement seven years later, when the criminal investigation re-commenced.  Wolk testified, "it appeared very evident that it was a much better strategy, given the type of victim you had.  You had a prostitute that was on drugs, smoking crack—had sex with multiple people," and "either had a bad recollection or was making stuff up." (Ex. P at 488–89).  Wolk testified that it was obvious to him that he would have more success at cross-examining the credibility of a drug-addicted prostitute versus Ms. Brown, a renowned scientific expert, or Nurse Cardenas, the nurse who simply determined that sperm was present on the vaginal swabs she collected from the victim.  Wolk testified that he and Petitioner agreed that they would pursue a strategy of de-emphasizing the DNA evidence, and focusing on the reliability and veracity of the victim's story that Petitioner was the man who raped her.  Wolk explained that the strategy was designed to create a reasonable doubt regarding whether a violent rape had even occurred and, if so, whether the victim had correctly identified her attacker.

Attorney Wolk admitted that at the time of Petitioner's trial, he did not have much experience with DNA evidence.  He testified that he read the FDLE reports and researched DNA standards and "how to look at it," but he did not research the statistical difference between "cold hits" and "probable cause hits" (Ex. P at 483–84, 491).  Wolk testified that if the statistics had not been so "staggering," he might have chosen to attack them (*id.* at 492–93).

After the parties presented evidence, counsel argued their respective positions on the IATC claims (Ex. P at 499–527).  At the conclusion of the hearing, the court orally announced its ruling:

> THE COURT:  . . . No. 1, notwithstanding the <u>United States v. Davis</u>[, 602 F. Supp. 2d 658 (D. Md. 2009)] case, which was decided March 16, 2009 . . . there's no evidence before the Court that that would provide ineffective assistance of counsel, without any evidence as to what—there's no expert testimony before the court that says that the methodology used by FDLE back in 2006 was—
>
> MS. CAPPLEMAN [counsel for the State]:  2007.
>
> THE COURT:  2007, at any rate.  That that would even have been a plausible trial strategy to even employ.  Further, this case was 2007. The case cited by the defense is a 2009 case, and they're talking about all sorts of standards and those sorts of things.  But there's no evidence before the court regarding any of that, No. 1.
>
> No. 2, counsel spoke with the defendant regarding trial strategy. He did file a motion to suppress the DNA evidence, because the sexual assault kit was destroyed.  That was denied.  So it was clear at that point

> that that was going to come in as evidence, the DNA evidence.  And I
> think it is sound trial strategy to try to distance oneself and not call
> attention to the DNA evidence; and try to poke holes in the State's case
> in other ways.  So that is sound trial strategy.  I don't think it rises to
> ineffective assistance of counsel.  And I have no evidence that—I don't
> think it would have changed the outcome of the trial.

(Ex. P at 528–29).

It is evident from the exchange between the parties and the court during those

arguments, as well as the court's oral announcement of its ruling at the conclusion of

the evidentiary hearing, that the basis for the court's denial of Petitioner's IATC

claims regarding counsel's failure to challenge the DNA evidence, was that defense

counsel made a tactical decision not to pursue a strategy of challenging the DNA

evidence, and that in the absence of any expert testimony showing that there was a

plausible basis for challenging the DNA evidence, Petitioner failed to demonstrate that

defense counsel's strategic choice was unreasonable, or that there was a reasonable

probability that the outcome of trial would have been different but for counsel's

strategic decision.  The First DCA affirmed the lower court's decision without written

opinion (Ex. T).

Where, as here, a state court makes a factual finding that counsel strategically

decided not to pursue a certain defense, that finding is entitled to a presumption of

correctness under § 2254(e)(1).  *See* <u>Fotopoulos v. Sec'y Dep't of Corr.</u>, 516 F.3d

1229, 1233 (11th Cir. 2008).

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and strategic
> choices made after less than complete investigation are reasonable
> precisely to the extent that reasonable professional judgments support the
> limitations on investigation.  In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision that makes
> particular investigations unnecessary.  In any ineffectiveness case, a
> particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of
> deference to counsel's judgments.

<u>Strickland</u>, 466 U.S. at 690–91.  Thus, "even when trial counsel's investigation and

presentation is less complete than collateral counsel's, trial counsel has not performed

deficiently when a reasonable lawyer could have decided, under the circumstances,

not to investigate or present particular evidence."  <u>Grayson v. Thompson</u>, 257 F.3d

1194, 1225 (11th Cir. 2001); *see also* <u>Wiggins v. Smith</u>, 539 U.S. 410, 523, 123 S. Ct.

2527, 156 L. Ed. 2d 471 (2003) ("[O]ur principal concern . . . is not whether counsel

should have presented a mitigation case.  Rather, we focus on whether the

investigation supporting counsel's decision not to introduce mitigating evidence of

[the petitioner's] background was itself reasonable.") (emphasis omitted).  If the

federal court concludes that declining to investigate further was a reasonable act, it

need not look to see what a further investigation would have produced.  *See* <u>Rogers</u> <u>v. Zant</u>, 13 F.3d 384, 388 (11th Cir. 1994).

In reviewing an attorney's professional judgments, "[a] decision to limit investigation is 'accorded a strong presumption of reasonableness.'" <u>Mills v.</u> <u>Singletary</u>, 63 F.3d 999, 1021 (11th Cir. 1995); *see also* <u>Strickland</u>, 466 U.S. at 690 ("counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment").  Indeed, as discussed *supra*, the federal court's standard is a high one—"[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers</u>, 13 F.3d at 386; <u>Chandler</u>, 218 F.3d at 1315 ("And because counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

Reasonableness is assessed objectively, measured "under prevailing professional norms," <u>Strickland</u>, 466 U.S. at 688, and includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time," *id.* at 689; *see also* <u>Hannon v. Sec'y, Dep't of Corr.</u>, 562 F.3d 1146, 1151 (11th

Cir. 2009) ("The standard we apply in assessing the first prong is that of a reasonable

attorney, not a paragon of the bar."); Williams v. Head, 185 F.3d 1223, 1236 (11th

Cir. 1999) ("'[I]n retrospect, one may always identify shortcomings,' but perfection

is not the standard of effective assistance."); Atkins v. Singletary, 965 F.2d 952, 958,

960 (11th Cir. 1992) ("Most important, we must avoid second-guessing counsel's

performance. . . . Nothing is so easy as to be wise after the event. . . .  A lawyer can

almost always do something more in every case.  But the Constitution requires a good

deal less than maximum performance.").  As the Eleventh Circuit said:

> In reviewing counsel's performance, a court must avoid using the
> distorting effects of hindsight and must evaluate the reasonableness of
> counsel's performance from counsel's perspective at the time. . . .  The
> widespread use of the tactic of attacking trial counsel by showing what
> "might have been" proves that nothing is clearer than hindsight—except
> perhaps the rule that we will not judge trial counsel's performance
> through hindsight.

Chandler, 218 F.3d at 1316–17 (quotations and citation omitted).  In other words,

federal habeas courts recognize that "the trial lawyers, in every case, could have done

something more or something different.  So, omissions are inevitable.  But, the issue

is not what is possible or what is prudent or appropriate, but only what is

constitutionally compelled."  *Id.* at 1313 (quotations omitted).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788. As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. (citations omitted).

Here, Attorney Wolk testified that he read Jo Ellen Brown's DNA report and researched DNA standards and "how to look at" the DNA evidence.  He also testified that he was familiar with Ms. Brown, and knew that she was "highly qualified" and

"astute" in her field.  Wolk testified that he initially pursued a strategy of challenging the DNA evidence, by filing a motion to suppress on the ground that the police had destroyed all of the evidence containing DNA, rendering it unavailable for testing by the defense (*see* Ex. A at 36–42), but this strategy hit a roadblock when the trial court denied the motion to suppress (*id.* at 80–86).  Counsel then shifted gears and focused on the theory that even if Petitioner had sex with the victim, it was consensual, and the victim's identifying Petitioner as the man who raped her was completely unreliable and possibly fabricated.

In light of the fact that all of the evidence from the rape that contained DNA had been destroyed, and in the absence of any expert testimony suggesting that there was a basis to challenge Ms. Brown's statistical methodology, the state court reasonably concluded that Petitioner failed to demonstrate that Attorney Wolk performed deficiently by failing to investigate or challenge the reliability of Ms. Brown's testing and conclusions.  Likewise, without any expert testimony that Ms. Brown's testing or statistical methodology was unreliable or unsound, the state court reasonably concluded that Petitioner failed to establish a reasonable probability that the outcome of trial would have been different if Attorney Wolk had investigated or challenged the reliability of Ms. Brown's analysis or conclusions.

Petitioner failed to demonstrate that the state court's adjudication of Claims Four, Five, Six, and Eight was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled to federal habeas relief on Claim Four, Five, Six, or Eight.

> C.   <u>Claim One:  "Trial counsel was ineffective for failing to object to the prosecutor exceeding the scope of direct examination and questioning on evidence not in evidence."</u>

Petitioner alleges the first question that the prosecutor asked him on cross-examination was the type of car he drove in 1999 (ECF No. 1 at 15–16).  Petitioner alleges the prosecutor then showed him a photograph of a white Buick Skylark, and asked him if it would refresh his recollection to view the picture and review records of the Department of Motor Vehicles ("DMV").  Petitioner alleges the prosecutor then referenced the photograph and DMV records during closing arguments.

Petitioner argues that defense counsel should have objected to this questioning on several grounds.  First, he argues the prosecutor's questioning was outside the scope of cross-examination, because Petitioner did not testify to a lack of recall, of either the DMV records or the photograph, on direct examination.  Second, Petitioner argues that the prosecutor failed to lay a proper predicate for using the photograph and DMV records to refresh Petitioner's recollection.  Third, Petitioner argues that the

prosecutor failed to disclose the photograph and DMV records during discovery.

Fourth, Petitioner argues that the contents of the DMV records were hearsay, and he

did not have an opportunity to "confront and cross-examine" the records.  Petitioner

argues he was prejudiced by counsel's failure to object, because it enabled the

prosecutor to elicit harmful testimony, which "inflamed the jury's mind" during

deliberations.

Respondent asserts Petitioner presented this claim to the state courts as Claim

Nine of his Rule 3.850 motion (ECF No. 16 at 10).  Respondent contends the state

court adjudicated the merits of the claim, and the adjudication was not based upon an

unreasonable determination of the facts, or contrary to or an unreasonable application

of clearly established federal law (*id.* at 10–12).

> 1.     Clearly Established Federal Law

The Strickland standard is the clearly established federal law applicable to this

claim.

> 2.     Federal Review of State Court Decision

Petitioner raised this claim as Claim Nine in his Rule 3.850 motion (Ex. N at

25–27).  The state circuit court denied the claim on the following grounds:

> [F]irst of all, you can refresh recollection with anything.  It's not subject
> to being disclosed as discovery.  Now if the State—if the State would

have attempted to introduce it as evidence, that's a different story.  But as we all learned in—at least if you had Ehrhardt on evidence—we all learned that you can refresh recollection with a pizza or a paper bag, it doesn't matter, so.

And in any event, if that was ineffective on counsel's part for not objecting, based on the totality of the evidence, I don't find that it would have altered the outcome of the case.

(Ex. P at 530).  Petitioner argued this issue on appeal of the circuit court's decision

(Ex. Q).  The First DCA affirmed the lower court's decision without written opinion

(Ex. T).

Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of Strickland, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law."  Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer

to the state's construction of its own law.") (citations omitted)[5]; *see also* <u>Callahan v. Campbell</u>, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); <u>Herring v. Sec'y Dep't of Corr.</u>, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . .  It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on

---

[5] <u>Alvord</u> was superseded by statute on other grounds as noted in <u>Hargrove v. Solomon</u>, 227 F. App'x 806 (11th Cir. 2007).

such matters.'") (alterations in original) (quoting <u>Agan v. Vaughn</u>, 119 F.3d 1538,

1549 (11th Cir. 1997)).

 The validity of the objections which Petitioner contends defense counsel should

have made (i.e., outside the scope of cross-examination, failure to lay a proper

foundation, failure to disclose the items during discovery, and hearsay) are questions

of state evidentiary law.  The state court already answered the question of whether

defense counsel had a valid basis, under state law, for objecting to the prosecutor's use

of the photograph and DMV records—defense counsel did not.[6]  This federal court

_____

 [6] The DMV records were not admitted into evidence (<i>see</i> Ex. C at 342–45).  Further, during
closing arguments, the prosecutor did not argue that the photograph or DMV records proved that
Petitioner owned the Buick Skylark.  The prosecutor argued:

  How was the defendant's memory today?  I don't remember.  I don't
remember.  I don't remember.  I remember hearing that a lot.  Did your wife have a
Buick Skylark.  No.  Did you ever have a Buick Skylark in 1999.  No.  A white,
four-door Buick Skylark.  You know, the victim said that the person who attacked
her drove up on her in a white, four-door car.  Interesting, he wouldn't remember
that.
. . . .
  If I showed you some driving records that indicated that your wife and
yourself had a white Buick skylark registered in your name, would that refresh your
memory.  I don't know.  What were you driving in 1999.  I had a '93 Ford Ranger.
It was autumn colored.  It just rolled right off the tongue.  Wasn't that convenient.
The car that implicated him, I don't know.  I can't remember.  I have no memory of
that.  I didn't drive that.  The car that may shield him from guilt, he knew everything
about it, even right down to the autumn color that the court had to even inquire what
is that, what is autumn color.

  Did the witness seem to have an accurate memory?  The state would submit
to you that the defendant absolutely did not have an accurate memory.  And
especially when it was critical.

must defer to the state court's determination of state law.  The failure by Petitioner's

counsel to make the objections that Petitioner contends he should have made (i.e.,

outside the scope of cross-examination, failure to lay a proper foundation, failure to

disclose the items during discovery, and hearsay) cannot be deemed deficient

performance, and Petitioner cannot show he was prejudiced by counsel's failure to

object, because the state court determined that counsel's objections had no arguable

basis for success.

Petitioner failed to show that the First DCA's adjudication of this IATC claim

was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not

entitled to relief on Claim One.

> D.     Claim Two:   "Trial counsel was ineffective for failing to object to
> impermissible shift of burden."

---

(Ex. C at 315–17).

Further, during defense counsel's closing, he highlighted the lack of evidence of the car's ownership:

> This car, this apparently a white Buick skylark that was tremendously important.  But I think that the point being, the only one thing you really need to take back when you deliberate on this case is the simple fact that if it was so important, why didn't they show any evidence of it?  Why didn't they get someone to come in here from the DMV, bring the records, and say here is the record list of cars he owns.  Bingo.  They didn't.  They provided no proof of that at all.  Pure speculation.  The natural conclusion is is [sic] because it's not there.

(Ex. C at 321–22).

Petitioner asserts that on direct examination, he testified that in 1993 his dentist installed gold teeth in his mouth, and he showed his gold teeth to the jury (ECF No. 1 at 17–18).  Petitioner alleges the prosecutor questioned him on cross-examination regarding his failure to produce his dental records or present testimony from his dentist.  Petitioner contends the prosecutor's questioning improperly shifted the burden of proof to the defense, and suggested to the jury that Petitioner had an obligation to present testimony from his dentist and produce his dental records in support of his defense.  Petitioner contends defense counsel was ineffective for failing to object, move for mistrial, or request a curative instruction.

Respondent asserts Petitioner presented this claim to the state courts as Claim Twelve of his Rule 3.850 motion (ECF No. 16 at 12).  Respondent contends the state court adjudicated the merits of the claim, and the adjudication was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (*id.* at 12–13).

1.    Clearly Established Federal Law

The Strickland standard is the clearly established federal law applicable to this claim.

2.    Federal Review of State Court Decision

Petitioner raised this claim as Claim Twelve of his Rule 3.850 motion (Ex. N

at 33–35).  The state circuit court adjudicated the claim as follows:

> Defendant claims counsel was ineffective for failing to object to
> questions asked of him on cross-examination which he alleges shifted the
> burden of proof.  The State correctly points out that the question was
> immediately stricken before an answer could be given.  Even assuming
> counsel's performance could be deemed deficient for failing to make the
> proposed objection to the entire line of questioning at issue, there is no
> reasonable probability that the outcome of the trial would have been
> different in light of the other evidence presented.

(Ex. N. at 124).  Petitioner argued this issue on appeal of the circuit court's decision

(Ex. Q).  The First DCA affirmed the lower court's decision without written opinion

(Ex. T).

During cross-examination of a defendant, or during arguments to the jury, the

prosecutor "may not make comments that would shift the burden of proof to the

defendant."  United States v. Bernal-Benitez, 594 F.3d 1303, 1315 (11th Cir. 2010).

Burden-shifting comments are those that "suggest that the defendant has an obligation

to produce any evidence or to prove innocence."  United States v. Simon, 964 F.2d

1082, 1086 (11th Cir. 1992).  However, a prosecutor may point out to the jury that

there is an absence of evidence on a certain issue.  See White v. State, 377 So. 2d 1149

(Fla. 1980).  Additionally, prosecutorial comment upon a general lack of defense

evidence is permissible.  See Smiley v. State, 395 So. 2d 235 (Fla. 1st DCA 1981).

When a criminal defendant testifies, the prosecutor is entitled to cross-examine him.  *See* United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009).  "[A] cross-examination necessarily entails testing the plausibility of a defendant's account."  *Id.*  For example, a prosecutor may ask a testifying defendant whether someone "could corroborate [his] testimony" when the defendant's testimony contradicts the government's evidence.  *See* United States v. Schmitz, 634 F.3d 1247, 1267 (11th Cir. 2011).

A prosecutor's burden-shifting statements require reversal when they are "so pronounced and persistent that [prosecutorial misconduct] permeates the entire atmosphere of the trial."  Simon, 964 f.2d at 1086.  "[P]rejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof."  *Id.* at 1087.

In Petitioner's case, the victim testified that she identified Petitioner as the person who raped her, from a photographic line-up (Ex. B at 62–64).  She also identified Petitioner in court as the rapist (*id.*).  On cross-examination, defense counsel asked the victim whether she had described to police any "conditions of the alleged attacker's teeth" (*id.* at 99).  The victim testified no (*id.*).  Counsel continued, "Yet you claim that the attacker smiled at you?" (*id.*).  The victim testified yes (*id.*).

The theory of defense was that even if Petitioner had sex with the victim, he was not the man who beat and raped her on the night in question. Petitioner testified on his own behalf. He testified that "about 25, 50 times" in the past, he had sought out prostitutes for sex (Ex. C at 247–48).[7] He testified that he "probably" had sex with the victim "at one point in time," but he did not remember it (*id.* at 247). Petitioner testified that if he had sex with her, it would have been consensual (*id.*). He denied that he attacked or raped the victim (*id.*). Defense counsel asked Petitioner to open his mouth and show the jury his teeth (*id.* at 248). Petitioner complied (*id.*). Petitioner testified that in 1993, a dentist placed a gold colored bridge in the upper part of his mouth (*id.*).

On cross-examination, the prosecutor asked Petitioner the following:

Q.      But if Ms. Kitchens [the victim] had seen inside your mouth she would have seen the gold teeth, right?

A.      Yes.

Q.      Because you have gold teeth and you had gold teeth in August of 1999; is that right?

A.      That's correct.

---

[7] The victim admitted that she was a prostitute at the time Petitioner raped her (Ex. B at 85–87).

Q.     Who was your dentist that put these gold teeth in your mouth?

A.     Mr. Sterling Watson.

. . . .

Q.     And is Mr. Watson still practicing dentistry?

A.     As far as I know.  I believe so.

Q.  Did you bring your records with you to show that these gold teeth were installed in your mouth in 1993?

A.     No, ma'am.

Q.     But would you agree that the gold teeth are a critical part of your defense in this case?

A.     I mean, do me?  Would I?  I mean, I'm not a lawyer so I don't know.

Q.     Okay.  Would you agree that it's important to show this jury that you had gold teeth in 1999?  Strike that.  Do the gold teeth come out?

A.     My bridge?

Q.     Are they removable?

A.     No, it's not removable.

(Ex. C at 266–67) (emphasis added).

The First DCA could have reasonably concluded that because Petitioner testified that he was not the man who beat and raped the victim on the night in

question, and the defense was claiming that the victim was wrong in identifying

Petitioner as the rapist, the prosecutor was entitled to ask questions that "tested the

plausibility of [Petitioner's] story."  *See* <u>Schmitz</u>, 634 F.3d at 1267.  The prosecutor

could do so by asking Petitioner whether he could corroborate his testimony that he

had gold teeth at the time of the rape.  *See id.*  Petitioner opened the door to the

prosecutor's asking him for corroborating evidence, and the prosecutor's questions

simply called into question whether Petitioner's story made sense and was supported

by the record evidence.

Additionally, the First DCA could have reasonably concluded that even if the

prosecutor's questions were improper, Petitioner failed to show he was prejudiced by

defense counsel's failure to object.  After the close of the evidence, the trial court

instructed the jury as follows:

> The defendant has entered a plea of not guilty.  This means you must
> presume or believe the defendant is innocent.  The presumption stays
> with the defendant as to each material allegation in the information
> through each stage of the trial unless it has become overcome by the
> evidence to the exclusion of and beyond a reasonable doubt.
>
> To overcome the defendant's presumption of innocence, the state
> has the burden of proving the crime with which defendant is charged was
> committed and the defendant is the person who committed the crime.
> The defendant is not required to present evidence or prove anything.
> . . . .

It is to the evidence introduced in this trial and to it alone that you are to look for that proof.  A reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in the evidence, or the lack of evidence.

(Ex. C at 304–05).

Because the court presumes that the jury followed its instructions, *see* Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000), the instructions "purge[d] the taint" of any allegedly improper questions or statements the prosecutor may have made.  *See* Simon, 964 F.2d at 1086–88 (holding that "although the prosecutor's remarks were probably improper, the district court rendered any error harmless by the repeated instructions to the jury that the defendant had no burden to produce any evidence"); *see also* Schmitz, 634 F.3d at 1267 ("[E]ven if some of the prosecutor's questions slightly suggested that Schmitz had the burden of proof, the district court cured any possibility of prejudice with its clear and repeated instructions on the prosecution's burden of proof.").

Petitioner failed to demonstrate that the First DCA's adjudication of his ineffective assistance of counsel claim was contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to relief on Claim Two.

  E. Claim Three:  "Trial counsel was ineffective for failing to object to trial court's response to jury's question and request readback [sic]."

Petitioner alleges during deliberations, the jury sent a question to the judge asking, "Could we obtain interview transcript of Inv. Beck?" (ECF No. 1 at 19–21). Petitioner alleges the trial court responded, with the consent of the prosecutor and defense counsel, by informing the jury in writing, "You must rely only on the evidence presented during trial."  Petitioner argues defense counsel should have objected to the court's response, on the ground that it suggested to the jury that there was no provision for them to review the content of Investigator Beck's interview, and counsel should have requested, pursuant to Rule 3.410 of the Florida Rules of Criminal Procedure, that the court inform the jury that portions of Investigator Beck's interview with Petitioner could be read back to them.

   Respondent asserts Petitioner presented this claim to the state courts as Claim Eight of his Rule 3.850 motion (ECF No. 16 at 14).  Respondent contends the state court adjudicated the merits of the claim, and the adjudication was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (*id.* at 14–15).

1.    <u>Clearly Established Federal Law</u>

The <u>Strickland</u> standard is the clearly established federal law applicable to this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Claim Eight of his Rule 3.850 motion (Ex. N at

22–25).  The state court adjudicated the claim as follows:

> Defendant claims counsel was ineffective for failing to ask for a
> mistrial or suggest a read-back of witness Beck's trial testimony pursuant
> to Rule 3.410 when the jury asked for a copy of the "interview transcript
> of Investigator Beck."  First and foremost, a request for a mistrial on the
> proposed ground would have been flatly refused as baseless.
> Furthermore, as the State correctly points out in its response, the jury
> was requesting a transcript of Beck's interview of the Defendant,[FN 1]
> not to have Beck's trial testimony read to them.  The Court finds no
> deficiency in counsel's failure to suggest that the jury be given material
> not entered into evidence, or provided with something they did not
> request.  Even assuming counsel's performance in the latter regard was
> deficient, there is no reasonable probability that it would have altered the
> outcome; Beck's testimony would have only served to loosely contradict
> Defendant's trial testimony, along with Defendant's vague,
> consent-based theory of the case.  Exh. 1. pp. 244–310.
>
> > [FN1:  It appears that the jury became aware of the
> > recording of the interview when it was used to refresh
> > Defendant's memory outside of their presence.  Ex. 1, pp.
> > 267–88, 291.]

(Ex. N at 124).  Petitioner argued this issue on appeal of the circuit court's decision

(Ex. Q).  The First DCA affirmed the lower court's decision without written opinion

(Ex. T).

The trial transcript shows that during the prosecutor's cross-examination of

Petitioner, the prosecutor asked:

> Q.     Mr. Blocker, if you were to review the interview that you had with Investigator Beck, would that refresh your memory regarding any of the things you testified that you did not tell Investigator Beck?
>
> A.     Yes, ma'am.
>
> . . . .
>
> Q.     So regarding the statements about only ever picking up a white prostitute in Rich Bay, not having sex with the victim, not knowing how your semen ended up in the victim, and working at the College Club Apartments, if you reviewed an interview to refresh your recollection about exactly what you said, that would not help you to tell the truth here today?
>
> . . . .
>
> A.     If I'm sitting there watching it, I'm pretty sure it would, you know, refresh my memory.

(Ex. C at 267–68).  Outside the presence of the jury, a video recording of Investigator Beck's interview with Petitioner was played (*id.* at 268–88).  The prosecutor then proffered, outside the presence of the jury, Petitioner's testimony that watching the video recording refreshed his recollection about some of the things he told Investigator Beck (*id.* at 288–89).  Upon conclusion of the proffer, the television upon which the video recording was played was removed from the courtroom (*id.* at 290).  The jury then re-entered the courtroom (*id.* at 291).  The prosecutor asked Petitioner whether, after reviewing the interview with Beck, his memory was refreshed about certain things (*id.*).  Petitioner responded yes (*id.*).  The prosecutor then questioned Petitioner about whether he told Investigator Beck certain things during the interview.

During deliberations, the jury requested "interview transcript of Officer Beck" (Ex. C at 344).  The trial court and counsel agreed that the jury could not have it, and that the proper response was for the court to inform the jury in writing that they must rely only on the evidence presented during the trial (*id.* at 344–45).

The jury's request was <u>not</u> to review <u>trial testimony</u>; rather, it was a request to review a transcript of an <u>interview</u>.  Investigator Beck and Petitioner described the interview in their testimony, but neither the video recording nor a transcript of the interview itself was admitted into evidence or published to the jury during trial. Therefore, this case is distinguishable from the cases relied upon by Petitioner in his reply, where Florida courts deemed it an abuse of discretion for the trial court to fail to inform the jury of the possibility of a read-back of trial testimony when denying the jury's request for transcripts of <u>trial</u> <u>testimony</u> (ECF No. 17 at 7–8).

The validity of the objection which Petitioner contends defense counsel should have made (i.e., objecting to the trial court's response to the jury's request for a transcript of Investigator Beck's interview with Petitioner) is a question of state law. The state court already answered the question of whether defense counsel had a valid basis, under state law, for the objection—defense counsel did not.  This federal court must defer to the state court's determination of state law.  The failure by Petitioner's

counsel to object to the court's response to the jury's request cannot be deemed deficient performance, and Petitioner cannot show he was prejudiced by counsel's failure to object, because counsel's objection had no arguable basis for success.

Petitioner failed to show that the First DCA's adjudication of this IATC claim was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to relief on Claim Three.

> F.    <u>Claim Seven:  "Trial counsel was ineffective for failing to object to introduction of impermissible prior consistent statements."</u>

Petitioner asserts defense counsel was ineffective for failing to object to the prosecutor's eliciting testimony from Officer Christopher and Nurse Cardenas regarding the victim's statements to them describing the rape (ECF No. 1 at 30–31). Petitioner contends counsel should have objected on hearsay grounds.  He contends the testimony was prejudicial because it corroborated the victim's testimony and thus bolstered her credibility.

Respondent asserts Petitioner presented this claim to the state courts as Claim Eleven of his Rule 3.850 motion (ECF No. 16 at 25).  Respondent contends the state court adjudicated the merits of the claim, and the adjudication was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (*id.* at 25–28).

       1.       Clearly Established Federal Law

The <u>Strickland</u> standard is the clearly established federal law applicable to this claim.

       2.       Federal Review of State Court Decision

Petitioner raised this claim as Claim Eleven of his Rule 3.850 motion (Ex. N at 30–33).

At Petitioner's trial, Officer Christopher testified that he spoke with the victim at the hospital on the night of the rape (Ex. B at 114–20).  The prosecutor asked Officer Christopher what the victim alleged had happened, and Christopher responded:

> She had stated that she was walking home to or walking towards her boyfriend's house from the Prince Murat Hotel, and a black male had approached her, hit her in the back of the head with a, she didn't know if it was a weapon or with a hand, dragged her off to the side to an area that was secluded.

> At that point, she was thrown to the ground, kicked in the head, kicked in the side of the stomach area, and was repeatedly told not to "look at me."  And at that point, he, the suspect, pulled her pants down and penetrated her vagina with his penis.

> She was unsure at the time, because she had been hit repeatedly in the head, as to the description of the individual, besides being a black male that's tall, thin, wearing white shoes.  At that point, she wasn't sure, as well, if he had gone long enough to ejaculate.  And he got up and she

got up and put her clothes back on and flagged down Officer Knutson
shortly thereafter.

(Ex. B at 117).   The prosecutor asked Officer Christopher whether the victim

described the hairstyle of her attacker (*id.* at 120).   Christopher responded that the

victim described it as "a thin haircut" (*id.*).

On  cross-examination,  Attorney  Wolk  elicited  testimony  from  Officer

Christopher that he (Christopher) had attempted to locate the exact area where the

attack occurred, but the victim did not provide information as to the exact area, so he

searched a more general area (*id.* at 122–23).   Officer Christopher testified that he did

not see any blood in the area, nor did he find any eyeglasses (the victim testified at

trial that her eyeglasses were knocked off of her face during the attack) (*id.*).   Attorney

Wolk elicited testimony from Officer Christopher that the victim never mentioned a

vehicle (*id.* at 124).   He also elicited testimony that the victim did not provide any

information about the attacker's teeth, nose, or other facial features (*id.* at 125–26).

Wolk elicited testimony that the only apparel described by the victim was the

attacker's shoes (*id.* at 125).   He also elicited testimony that the victim told Officer

Christopher that she never saw a weapon (*id.* at 126).

Virginia Cardenas, an Advanced Registered Nurse Practitioner, testified that she

examined the victim at the hospital after the attack (Ex. B at 131–33).   Nurse Cardenas

testified that in order to assist her in providing proper medical treatment, she asked the victim to describe the incident that caused her injuries, and Cardenas reported that information in the victim's medical records, which were admitted into evidence at trial (*id.* at 137). Nurse Cardenas testified as follows:

> [P]atient states she was beaten and kicked, states almost lost consciousness, injury to her right eye, eyebrow, forehead, bruise to the left elbow, left wrist, right side of the neck, right ears [sic], right forearm. She admits vaginal penetration. She doesn't know if he ejaculated nor assailant [sic] used condom. She denied oral or anal assault.

(Ex. B at 137–38). Nurse Cardenas testified that the victim claimed that she did not know her attacker (*id.* at 138).

On cross-examination, Attorney Wolk elicited testimony from Nurse Cardenas that the medical records indicated that the victim admitted to using crack and marijuana that evening (Ex. B at 150).

At trial, Charlene Kitchens, the victim, described the evening of the attack as follows. She testified that at the time, on August 15, 1999, she was addicted to crack cocaine and was working as a prostitute (Ex. B at 27–28). She testified that prior to the attack, she had sex with an older black man at the Prince Murat hotel and then smoked crack cocaine (*id.* at 30–31). She testified that the man used a condom, and that she "always used protection" (*id.* at 42). Kitchens testified that the man took her

to get more crack and then dropped her off at the hotel (*id.*). She testified that she

smoked the crack and then left the hotel and started walking down Brevard Street (*id.*

at 31).

Ms. Kitchens testified that as she was walking, a man drove up in a white four-

door car with burgundy velour seats (Ex. B at 31). She testified that the man asked

her if she was "shaking" (meaning, prostituting), and she responded yes (*id.* at 31–32).

Kitchens testified that the man leaned across the passenger seat and opened the car

door for her (*id.* at 32). She testified that she entered the car and told him that she had

a hotel room, but he responded that hotels made him nervous (*id.*). The victim

testified that she looked around the car and saw papers strewn everywhere (*id.*). She

testified that the man drove behind a fenced-in building, and she immediately exited

the car (*id.* at 33). Kitchens identified photographs of the location where the attack

occurred, and she testified she was able to take police to the exact location of the

attack years later (*id.* at 45). Kitchens testified that upon exiting the man's car and

closing the door, the man was "already right beside me" (*id.* at 48–49). She testified

that the man took out a beige pouch and was looking in it, and the next thing she

knew, she felt a "big hit" near her right eye (*id.* at 50). Kitchens testified that she did

not know what the man hit her with (*id.*). She testified that blood started running

down her face (*id.* at 51).  She testified that the man pushed her onto the ground and

started kicking her in the ribs, and then jumped over her, kicking her on both sides

(*id.*).  Kitchens testified that she "raised up" and begged him to stop (*id.* at 52).  She

testified that her right eye was swelling, and she noticed that her eyeglasses were gone

(*id.*).  Kitchens testified that the man told her to pull her pants down, so she did (*id.*).

She testified that he pulled his pants down and then got down on her and put all his

weight on her chest (*id.*).  She testified that the man pushed her face away and said,

"Don't look at me.  I'll kill you.  I'll kill you.  Don't look at me." (*id.* at 52–53).

Kitchens testified that the man "was humping away," and his penis penetrated her

vagina (*id.* at 53–54).  She testified that she believed he ejaculated (*id.* at 54).

Kitchens testified that she was lying on the concrete, bleeding (*id.*).  She further

testified that the man got up, pulled up his pants, and pulled out a gun (*id.* at 56).  She

testified that she did not actually see the object in his hand, but she saw something

black, and he was holding it like a person holds a gun (*id.*).  Kitchens testified that she

heard a click, but then the man jumped in the car and backed out of the area (*id.* at

56–57).  Kitchens testified that she jumped up, put her clothes on, and ran to the road

(*id.* at 58).  She testified that she flagged down a sheriff's officer, and he called an

ambulance (*id.*).  Ms. Kitchens testified that she "had a good look" at the man when

she first got into his car (*id.* at 55).  She testified that after the attack, she was

confident that she would be able to recognize him (*id.*).  Kitchens admitted that she

did not tell police that she was a prostitute and on drugs (*id.* at 57–58).  She admitted

that she did not give police a description of her attacker, because she was afraid that

he would kill her (*id.* at 61).  She testified that she did not contact police to follow up

on the investigation (*id.*).  Kitchens testified that seven years later, in August of 2006,

police contacted her, and she provided more information (*id.* at 61–62).  She testified

that an officer showed her six photographs, and she immediately identified her

attacker (*id.* at 62–63).  She testified she was "a hundred percent" confident that she

identified the correct person (*id.* at 63).  Kitchens identified Petitioner in court as her

attacker (*id.* at 63–64).

On cross-examination, Attorney Wolk elicited Ms. Kitchens' admission that on

the night of the attack, she never mentioned to police that her attacker used a gun or

tried to shoot her (Ex. B at 73).  She also admitted that she never mentioned a gun to

police during an interview on August 22, 2006 (*id.* at 73–79).  Kitchens admitted that

she had been smoking crack for five hours prior to the attack, but testified that she was

not high at the time of the attack (*id.* at 82–83).  Kitchens testified that she did not

smoke marijuana, but then admitted that her medical records stated that she admitted

to using marijuana that night (*id.* at 83–85).  Kitchens admitted that at the time of the

attack, she had been addicted to crack cocaine for ten years (*id.* at 86). Attorney Wolk

questioned Kitchens extensively about her prostitution (*id.*).  Kitchens testified that

approximately five hours elapsed between the time she had sex with the older man in

the hotel room and the time of the attack (*id.* at 87–88).

Attorney Wolk elicited admissions from Ms. Kitchens that on the night of the

attack, she did not provide much of the information that she provided seven years later

(Ex. B at 93–).  For example, Kitchens admitted that she did not describe a car to

police or even mention that a car was involved (*id.* at 94).  She admitted that she did

not tell police about how she met the attacker and that she drove around with him (*id.*

at 94–95).  She admitted that she never told police she looked at her attacker (*id.* at

97–98).  She admitted that even though she testified that her attacker was wearing

long, khaki-colored shorts, she did not give police that information (*id.* at 98).

Attorney Wolk also elicited Ms. Kitchens' admission that on the night of the attack,

she lied to police and told them that the attacker grabbed her by the hair and forced

her over to a building (*id.* at 97).  She admitted that she did not tell police that she was

struck in the face from the front after getting out of the car, even though she testified

to those facts on direct examination (*id.*).  Kitchens admitted that the  description of

the attacker's hair that she initially provided to police was different than the description she provided at trial (*id.* at 99–100).  Kitchens admitted that she did not initially tell police that the man ejaculated, even though she testified at trial that he did (*id.* at 100–01).  Attorney Wolk elicited Ms. Kitchens' admission that even though she testified at trial that she got "a really good look" at her attacker, she did not provide details about his physical appearance to police on the night of the attack (*id.* at 101–02).

At the post-conviction evidentiary hearing, Attorney Wolk testified that it was a strategic decision to allow the victim's statements to Officer Christopher and Nurse Cardenas to come into evidence (Ex. P at 473–81, 488–89).  Wolk testified that he wanted to use the testimony regarding the victim's previous description of what happened, in order to highlight to the jury that those prior statements, made at the time of the event, were very vague in comparison to all of the details the victim provided to law enforcement and at trial seven years later.  Attorney Wolk testified that there were many inconsistencies and conflicts between the victim's initial statements to the police, her statements to medical personnel, and her statements at trial.  He testified that the victim gave a lot more information at trial than she initially gave to the officers, and "that didn't add up." (*id.* at 473–74).  Wolk testified, "We wanted to

show that she [the victim] has all this information now, many years later," but when she spoke to a nurse and law enforcement immediately after the rape "she didn't have anything" (*id.* at 480–81).  Wolk testified that Nurse Cardenas' testimony regarding the victim's prior statements was "a pivotal part" of the defense, and that Petitioner had agreed to this strategy (*id.*).

The state circuit court found as fact that Attorney Wolk made a strategic decision not to object to the victim's hearsay statements (Ex. P at 529).  The court determined that  defense counsel's decision was reasonable for two reasons.  First, by not objecting, defense counsel was able to point out and draw attention to the fact that the victim provided significantly more detail about the rape in the description she provided <u>years</u> after the rape than she provided <u>immediately</u> after the rape (*id.*).  Second, if counsel had objected, it would have drawn even more attention to the victim's statements (*id.* at 529–30).  The First DCA affirmed the circuit court's decision without written opinion (Ex. T).

The record clearly supports the state court's factual finding that counsel's failure to object to the victim's hearsay statements (admitted through the testimony of Officer Christopher and Nurse Cardenas) was a strategic decision.  Therefore, that factual finding is entitled to a presumption of correctness.  With regard to the state

court's determination that counsel's strategic decision was reasonable, Petitioner has not demonstrated that this determination was unreasonable.  By allowing the victim's prior statements to come in, defense counsel was able to emphasize to the jury that the victim's description of the rape was much more detailed seven years after it occurred, than the description she provided immediately after it occurred, and that that variance suggested that her testimony was unreliable and not worthy of belief.

Petitioner failed to demonstrate that the state court's adjudication of this IATC claim was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of Strickland.  Therefore, Petitioner is not entitled to federal habeas relief on Claim Seven.

## IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>8th</u> day of February 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

   **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**